# United States District Court
### for the
### Western District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

**FILED**
**NOV 13 2019**
**MARY C. LOEWENGUTH, CLERK**
**WESTERN DISTRICT OF NY**

**THE EMAIL ACCOUNT: jwhite015@rochester.rr.com**

**Case No. 19-MJ-4164**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: **THE EMAIL ACCOUNT: jwhite015@rochester.rr.com** as more particularly described in **Attachment A,**

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*: *See* **Attachment B for the Items to be Seized, all of which are fruits, evidence and instrumentalities of violation of Title 18, United States Code, Sections 1343, 1349, 1512(c)(1) and 1519 and all of which are more fully described in the application and affidavit filed in support of this warrant, the allegations of which are adopted and incorporated by reference as if fully set forth herein.**

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of **Title 18, United States Code, Sections 1343, 1349, 1512(c)(1) and 1519.**

The application is based on these facts:
- ☒ continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Eric J. Bizjak, Assistant Special Agent in Charge
U.S. HUD-OIG Office of Investigations
*Printed name and title*

Sworn to before me and signed in my presence.
Date: November 13 , 2019

*Judge's signature*

City and state: Rochester, New York

MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

# ATTACHMENT A
## Property to Be Searched

This warrant applies to information associated with:

jwhite015@rochester.rr.com that is stored at the premises controlled by Charter Communications, Inc., a company that accepts service of legal process at 12405 Powerscourt Drive, Saint Louis, MO 63131.

# ATTACHMENT B
## Particular Things to be Seized

**I.     Information to be disclosed by Charter Communications, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on or about August 30, 2019 (Provider preservation record number: 87854) for jwhite015@rochester.rr.com, the Provider is required to disclose the following information to the government for the account or identifier listed in Attachment A:

a.     The contents of all emails associated with the account from March 1, 2018 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination address associated with each email, the date and time at which each emails was sent, and the size and length of each email;

b.     All record or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, the log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of services utilized;

d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files, and;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 18 United States Code, Section 1343 (wire fraud), 1349 (conspiracy to commit wire fraud), Section 1512(c)(1) (tampering with documents), and Section 1519 (falsification of records in a federal investigation) those violations involving GEORGE MOSES, JANIS WHITE and others, and occurring after March 1, 2018, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      All communications between JANIS WHITE and GEORGE MOSES, and any and all communications that JANIS WHITE had with the following individuals or entities:  Rochester Housing Charities or its employees, including Shirley Boone, Mike Buie, Ineabelle Geena Cruz, Christina Irish, Kevin White, or Ryan Van Alstyne; Rochester Housing Authority or its employees; or High Performance Heating and Cooling or its employees, including Matthew Nicodemus or Justina Stevens; Grant Heating and Cooling or its employees, including William Grant; contractor Jeffrey Smalls; HJJ Property Development     or      its      employees;     or      georgemoses@hotmail.com,

jwhite015@rochester.rr.com,  krwhite89@gmail.com,  or   larrywhite1124@gmail.com; to include all attachments to said emails.

      b.    Evidence regarding the fraudulent awarding of Rochester Housing Authority ("RHA") and Rochester Housing Charities ("RHC") contracts;

      c.    Evidence regarding the identification of other individuals involved in the awarding of RHA and RHC contracts through fraud or false statements;

      d.    Evidence related to who created, used, or communicated with the account relating to the fraudulent awarding of RHA and RHC contracts, including records about their identities and whereabouts;

      e.    Evidence related to defrauding government agencies, including the U.S. Department of Housing and Urban Development;

      f.    Evidence indicating the email account owner's state of mind as it relates to the crime under investigation.

# ADDENDUM TO SEARCH WARRANT
## SEARCH OF COMPUTERS

1.   The computer or electronic media search authorized by this warrant shall be completed within 60 days from the date of the warrant unless, for good cause demonstrated, such date is extended by Order of this Court.

2.   In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize computer search methodology to search only for files, documents or other electronically stored information which are identified in the warrant itself.

3.   Should the government not locate any of the items specified in the warrant (or other fruits, contraband, instrumentalities, or property subject to forfeiture) within the authorized search period (including any extensions granted), the government shall return the computer or electronic media to the owner.

4.   In any circumstance not covered by paragraph three (3) above, upon completion of the search, the government, upon request of the owner of the computer, shall promptly return to the owner of the computer copies of all files and documents requested and specified by the owner, excluding any items or files seized pursuant to the warrant or other fruits, contraband, instrumentalities or property subject to forfeiture.

5.   If electronically stored data or documents have been identified by the government pursuant to this warrant, or other fruits, contraband, instrumentalities or property subject to forfeiture, the government may retain the original hard drive or other data storage mechanism pending further order of this Court.  The retention of the original hard drive or other data storage mechanism does not relieve the government of its obligation to return to the owner of the computer files, documents or other electronically stored information identified in paragraph four (4) above.

6.   Nothing in this warrant shall limit or prevent the government from retaining the computer or electronic media as fruits, contraband, or an instrumentality of a crime or commencing forfeiture proceedings against the computer and/or the data contained therein. Nothing in the warrant shall limit or prevent the owner of the computer or electronic media from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property or (b) making a request of the government to return certain specified files, data. Software or hardware.

7.   Should there be a dispute or a question over ownership of any computer or any electronically stored data or documents stored therein, the government shall promptly notify this Court so that such dispute or question can be resolved.

**THE DISTRICT COURT OF THE UNITED STATES**
**For the Western District of New York**

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH

jwhite015@rochester.rr.com

Case No. *19-MJ-4164*

THAT IS STORED AT THE PREMISES
CONTROLLED BY
CHARTER COMMUNICATIONS, INC.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Eric J. Bizjak, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with:

Road Runner e-mail account jwhite015@rochester.rr.com that is stored at the premises owned, maintained, controlled, or operated by Charter Communications, Inc., 12405 Powerscourt Drive, Saint Louis, MO 63131.

2.     The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703 (c)(1)(A) to require Charter Communications, Inc.to disclose to the government copies of the information (including the content and communications) further described in Section I of Attachment B. Upon receipt of the information as described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

1

3.      I am an Assistant Special Agent in Charge of the U.S. Department of Housing and Urban Development ("HUD") Office of Inspector General ("OIG") and have been so employed for over 16 years.  I have been trained to investigate, and have participated in investigations of, a wide range of federal criminal violations, including fraud and public corruption.  I am empowered by law to conduct investigations of, and make arrests for, offenses against the United States.

4.      The factual information supplied in this affidavit is based on my own investigation in this case, including witness interviews and reviews of records, my experience as a HUD OIG Special Agent, and information provided by other law enforcement officers engaged in the investigation.  This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about the matter.

5.      Based on my training an experience and the facts set forth in this affidavit, there is probable cause to believe that violations of violations of Title 18 United States Code, Section 1343 (wire fraud), 1349 (conspiracy to commit wire fraud), Section 1512(c)(1) (tampering with documents), and Section 1519 (falsification of records in a federal investigation) have been committed by GEORGE MOSES and JANIS WHITE among others.  There is also probable cause to search the email information described in Attachment A for evidence, instrumentalities, contraband or fruits of crimes further described in Attachment B.

## JURISDICTION

6.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction' as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States…that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A(i).

## INDIVIDUALS AND ENTITIES INVOLVED

### *Rochester Housing Authority and Rochester Housing Charities*

7.     GEORGE MOSES ("MOSES") resides in Rochester, New York and is the Executive Director of the North East Area Development ("NEAD"). MOSES was the Chairman of the Board of Commissioners of the Rochester Housing Authority ("RHA") until sometime in 2018. MOSES was also a member of the board of directors of the RHC from in or about March 2015 to sometime in 2017.

8.     JANIS WHITE ("WHITE") resides in Rochester, New York and is the Executive Secretary for the Director of the RHA and the previous board secretary for the Rochester Housing Charities ("RHC").   WHITE has also acted as a bookkeeper for RHC in previous years and recorded the board minutes for the RHC board meetings.

9.     The RHA was located in Rochester, New York and provides housing opportunities and services for the Rochester community. The RHA oversees approximately 2,500 public-housing units, millions of dollars, and subsidies for tens of thousands of people. The RHA has an annual contract with the United States Department of Housing and Urban Development from which it received millions of dollars in federal assistance.

3

10.     The RHC was located in Rochester, New York.  On or about March 26, 2012, the RHA formed the RHC to assist in advancing the purposes of the RHA. Prior to on or about March 25, 2015, the RHC had effectively been a dormant company with no funds or assets since its inception.  The RHC received in excess of $10,000.00 a year in federal assistance from the federal assistance received by the RHA.

### *HJJ Property Development*

11.     HJJ Property Development ("HJJ Property") filed a d/b/a with Monroe County, New York, on March 9, 2018, with an address of 21 Bock Street, Rochester, NY. The d/b/a was filed by Margaret Jones and Howard Jones Jr., mother and stepfather of WHITE. HJJ Property was listed as a HVAC maintenance business.  While HJJ Property was owned by Margaret Jones and Howard Jones, Jr., WHITE actually controlled HJJ Property.

12.     On or about April 25, 2018, WHITE at jwhite@xposureschools.com received an email from orders@govdocfiling.com that EIN 82-5323125 had been successfully assigned to HJJ Property.

### *Contractors*

13.     Contractor 1 is located in Rochester, New York and provided heating and cooling installation and repair services and air conditioning systems.  Contractor 1 provided services for the RHC.

14.     Contractor 2 is a sole proprietor roofing business in Rochester, New York.

4

## SCHEME AND CONSPIRACY

15.     Between in or about March 2018, and in or about February 2019, in the Western District of New York, MOSES and WHITE did knowingly and unlawfully conspire and agree with others to devise a scheme to defraud the RHC, and to obtain money from the RHC by means of false and fraudulent pretenses, representations, and promises, and for the purposes of executing such scheme and artifice, to transmit, and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds.

16.     Records obtained through the investigation indicate that between in or about April 2018 through December 2018, MOSES, WHITE and others caused HJJ Property to provide fraudulent invoices totaling approximately $87,069.00 to the RHC, and caused the RHC to pay HJJ Property the approximate amount of $87,069.00, despite the fact that HJJ Property never performed services for the RHC.

17.     The scheme generally involved the following:

a.     At times, WHITE would prepare a fraudulent invoice from HJJ Property addressed to the RHC which made it appear that HJJ Property had provided services to the RHC. Despite HJJ Property providing no services to the RHC, WHITE caused the RHC to pay HJJ Property the amount contained on the fraudulent HJJ Property invoice.

b.     On other occasions, a contractor would provide an employee of the RHC with an estimate for services to be performed for the RHC. The RHC employee would email the estimate to MOSES, who approved the hiring of vendors for the RHC, who was not the Executive Director of the RHC, but was a person who maintained influence and control over the RHC. MOSES would then email the estimate to WHITE.

5

c.     WHITE would then prepare a fraudulent invoice from HJJ Property addressed to the RHC. The fraudulent invoice made it falsely appear that HJJ Property would be providing the services to the RHC that were actually going to be performed by the contractor. The amount requested to be paid on the HJJ Property fraudulent invoice would be more than what the contractor had originally requested for such services.

d.     WHITE or MOSES would then email to an employee of the RHC the HJJ Property fraudulent invoice. The RHC employee would submit the HJJ Property fraudulent invoice for payment to the RHC and MOSES would authorize the RHC to pay HJJ Property the fraudulent amount.

e.     WHITE, on behalf of HJJ Property, would then provide a cashier's check made payable to the contractor in the amount that the contractor had originally estimated and requested for the services it performed for the RHC.

f.     The difference between what the RHC paid HJJ Property and what HJJ Property paid the contractor was the amount that MOSES, WHITE and others caused the RHC to fraudulently overpay for the services provided by the contractor. Between in or about March 2018, and in or about July 2018, this amount was approximately $48,698.00.

**Interviews**

18.     On December 14, 2018, Margaret Jones and Howard Jones, Jr. were interviewed. Howard Jones, Jr. stated that his intention was to start HJJ Property with his son Larry White. He further stated that he became ill shortly after the business was formed and that Larry White showed no interest in the business. Howard Jones, Jr. further admitted that HJJ Property performed no work and was unaware of why any payments were paid to his company HJJ Property.

6

19.     Margaret Jones stated that her daughter WHITE directed her and helped her open the bank account for HJJ Property. Margaret Jones advised that WHITE had access to the bank account and believed payments from the bank account were used to pay subcontractors.

20.     On January 3, 2019, Witness A, the owner of Contractor 1, was interviewed and advised that he began doing work for the RHC in and about March 2018. Witness A stated that he would deal with Kevin White, the RHC operations manager, or a maintenance employee of the RHC. Witness A stated that the work Contractor 1 performed included boiler repair, service cleaning and installation. Witness A stated that he never dealt with nor knew of anyone associated with HJJ Property, and did not recall ever hearing of HJJ Property. Witness A recalled receiving cashier's checks for the services performed by Contractor 1 for the RHC, which checks were usually delivered by the operations manager or maintenance employee of the RHC.

21.     On February 6, 2019, Kevin White, the Operations Manager for the RHC, was interviewed and advised that he began working at the RHC in and about April 2018. When Kevin White started at the RHC, Contractor 1 was already performing HVAC related services for the RHC. Shortly thereafter, MOSES told Kevin White to utilize a company called HJJ Property for HVAC services. Having no contact information for HJJ, Kevin White continued to utilize Contractor 1 for all HVAC related issues and Kevin White was never contacted by nor dealt with anyone associated with HJJ Property.

22.     Kevin White also advised that after contacting Contractor 1 about hiring Contractor 1 to provide services for the RHC, Contractor 1 would provide him with an estimate of the work to be performed. Kevin White would then provide the estimate to

MOSES via e-mail which was transmitted in interstate commerce. After a short period of time, Kevin White would receive an email in return from either MOSES or WHITE with an invoice attached from HJJ Property, describing the exact, or nearly the exact, same services that Contractor 1 would be performing, but at a higher dollar amount. Kevin White would then advise Contractor 1, not HJJ Property, to begin doing the work. He would then forward the HJJ Property invoice to the RHC central office for payment.

23.     Kevin White stated that after sending the HJJ Property invoice to the RHC, WHITE would come to his office with a cashier's check in the amount that Contractor 1 originally charged in its estimate.   Kevin White would then provide the cashier's check to Contractor 1.

### Fraudulent HJJ Property Invoices

24.     Invoices obtained through the investigation show multiple invoices from Contractor 1 with detailed descriptions of work completed. Another set of invoices obtained from the RHC show invoices from HJJ Property with nearly the exact description on Contractor 1's invoice but with a higher dollar amount.

#### *HJJ Property Invoice #1001*

25.     On or about April 10, 2018, at approximately 3:15 p.m, WHITE from jwhite@xposureschools.com emailed fraudulent HJJ Property invoice, Invoice #1001, to GEORGE MOSES at gmoses@hotmail.com. Fraudulent HJJ Property invoice #1001 made it falsely appear that HJJ Property would be performing services for the RHC.

26.     On or about April 19, 2018, as a result of the fraudulent HJJ Property invoice, the RHC paid HJJ Property the amount of $1,200.00 for no services provided.

### *HJJ Property Invoice #1011:*

27.     On or about April 18, 2018, Contractor 1 provided an estimate addressed to the RHC in the amount of $681.48 for various services Contractor 1 then performed for the RHC.

28.     On or about April 27, 2018, at approximately 11:01 a.m., WHITE from jwhite@xposureschools.com emailed fraudulent HJJ Property invoice, Invoice #1011, to MOSES at georgemoses@hotmail.com.  Fraudulent HJJ Property invoice #1011 was for $881 which contained almost the exact description of the services to be performed as the description contained on Contractor 1's estimate.

29.     On or about April 27, 2018, MOSES from georgemoses@hotmail.com forwarded the email to RHC employee Kevin White at krwhite89@gmail.com.

30.     On or about April 27, 2018, Kevin White from krwhite89@gmail.com emailed fraudulent HJJ Property invoice #1011 to the RHC office manager for approval.

31.     On or about April 27, 2018, at approximately 1:15 p.m., the RHC office manager forwarded the email to MOSES.  The body of the email contains the following:

> G
> *For review/approval*

32.     On or about April 27, 2018, at approximately 6:19 p.m., MOSES from gmoses@neadrochester.org emailed the RHC employee the following:

> *Okay to process.  I should have the budget done by the time I get back so I know exactly where we can actually plan these into the yearly maintenance.*

33.     On or about April 28, 2018, at approximately 5:48 p.m., the RHC office manager emailed Kevin White at krwhite89@gmail.com and another RHC employee the following:

> *All,*
> *Approval to proceed with boilers per attached proposals.*

9

34.     On or about May 5, 2018, WHITE paid Contractor 1 the amount of $681.48 for the services performed by Contractor 1, and caused HJJ Property to reimburse her for such payment.    Thus, the RHC was defrauded of $199.52 ($881.00 - $681.48).

**_HJJ Property Invoice #1015_**

35.     On or about April 20, 2018, Contractor 1 provided an estimate addressed to the RHC in the amount of $1,180.00 for various services Contractor 1 then performed for the RHC.

36.     On or about April 27, 2018, at approximately 11:01 a.m., WHITE from jwhite@xposureschools.com emailed fraudulent HJJ Property invoice, Invoice #1015, to MOSES at georgemoses@hotmail.com.  Fraudulent HJJ Property invoice #1015 was for $1,590 which contained almost the exact description of the services to be performed as the description contained on Contractor 1's estimate.

37.     On or about April 27, 2018, MOSES from georgemoses@hotmail.com forwarded the email to RHC employee Kevin White at krwhite89@gmail.com.

38.     On or about April 27, 2018, Kevin White from krwhite89@gmail.com emailed fraudulent HJJ Property invoice #1015 to the RHC office manager for approval.

39.     On or about April 27, 2018, at approximately 1:15 p.m., the RHC office manager forwarded the email to MOSES.  The body of the email contains the following:

> G
> For review/approval

40.     On or about April 27, 2018, at approximately 6:19 p.m., MOSES from gmoses@neadrochester.org emailed the RHC office manager the following:

> Okay to process.  I should have the budget done by the time I get back so I know exactly where we can actually plan these into the yearly maintenance.

10

41.     On or about April 28, 2018, at approximately 5:48 p.m., the RHC office manager emailed Kevin White at krwhite89@gmail.com and another RHC employee the following:

> *All,*
> *Approval to proceed with boilers per attached proposals.*

42.     On or about May 9, 2018, HJJ Property paid Contractor 1 the amount of $1,180.00 for the services performed by Contractor 1.  Thus, the RHC was defrauded of $410.00 ($1,590.00 - $1,180.00).

### *HJJ Property Invoice #1005:*

43.     On or about April 20, 2018, Contractor 1 provided an estimate addressed to the RHC in the amount of $9,000.00 for various services Contractor 1 then performed for the RHC.

44.     On or about April 23, 2018, at approximately 5:29 p.m., Contractor 1's estimate was emailed to MOSES at gmoses@neadrochester.org.

45.     On or about April 23, 2018, at approximately 10:04 p.m., MOSES from gmoses@neadrochster.org forwarded the estimate via email to WHITE at jwhite015@rochester.rr.com.

46.     On or about April 23, 2018 at approximately 11:54 p.m., WHITE from jwhite015@rochester.rr.com emailed fraudulent HJJ Property invoice, Invoice #1005, to MOSES at georgemoses@hotmail.com. Invoice #1005 was for $11,000 which contained almost the exact description of the services to be performed as the description contained on Contractor 1's estimate.

11

47.     On or about May 9, 2018, HJJ Property paid Contractor 1 the amount of $9,000.00 for the services performed by Contractor 1.  Thus, the RHC was defrauded of $2,000.00 ($11,000.00 - $9,000.00).

### *HJJ Property Invoice #1045*

48.     On or about June 21, 2018, Contractor 1 provided an invoice made out to the RHC in the amount of $9,000.00 for *"Misc install, Building C…Install modulating condensing gas boiler-drain system-complete removal of old system……purge air-restart and check per manufactures' specs…"*.

49.     On or about June 21, 2018, WHITE from jwhite015@rochester.rr.com emailed MOSES at georgemoses@hotmail.com fraudulent HJJ Property invoice, Invoice #1045, for $15,000, which stated *"Misc Install: Building C, Install Modulating Condensing Gas Boiler….purge air-restart and check per manufacturers' spec.."*.

50.     On or about June 21, 2018, MOSES from georgemoses@hotmail.com forwarded WHITE's email to Kevin White at krwhite89@gmail.com.

51.     On or about July 3, 2018, Kevin White emailed Invoice #1045 to the RHC office manager, which caused the RHC to pay HJJ Property the amount of $15,000. WHITE then provided a cashier's check made payable to Contractor 1 in the amount of $9,000.00. Thus, WHITE defrauded the RHC into paying $6,000.00 more than it should have paid for the services performed by Contractor 1.

### *HJJ Property Invoice #1023*

52.     On or about May 17, 2018, Contractor 1 provided an estimate addressed to the RHC in the amount of $594.00 for services Contractor 1 then performed for the RHC.

53.     On or about May 17, 2018, at approximately 9:21 p.m., Contractor 1's estimate in the amount of $594.00 was emailed to MOSES at gmoses@neadrochester.org.

54.     On or about May 17, 2019, at approximately 9:29 p.m., MOSES from gmoses@neadrochester.org forwarded the email to WHITE at jwhite015@rochester.rr.com.

55.     On or about May 23, 2018 at approximately 1:04 a.m., WHITE from jwhite@015@rochester.rr.com emailed fraudulent HJJ Property invoice, Invoice #1023, in the amount of $1,800.00 which contained almost the exact description of the service to be performed as the description contained on Contractor 1's estimate, to MOSES at georgemoses@hotmail.com.  The body of the email included the following:

*Please review*

56.     On or about May 23, 2018, at approximately 10:56 a.m., MOSES from georgemoses@hotmail.com emailed fraudulent HJJ Property invoice #1023 to Kevin White at krwhite89@gmail.com. Kevin White responded:

*Got it, thanks!*

57.     On or about May 23, 2018, at approximately 12:20 p.m., Kevin White sent an email with fraudulent HJJ Property invoice #1023 to the RHC office manager.  The body of the email contained the following:

*Good afternoon,*
*Can we have these invoices processed for the service of the boilers?*
*Thanks.*

58.     On or about May 24, 2018, the RHC paid HJJ Property the fraudulent amount of $1,800.00.

59.     On or about May 26, 2018, WHITE paid Contractor 1 the amount of $594.00 for the services performed by Contractor 1, and caused HJJ Property to reimburse her for such payment.

### *HJJ Property Invoice #1025*

60.     On or about May 21, 2018, Contractor 1 provided an estimate addressed to the RHC in the amount of $990.00 for services Contractor 1 then performed for the RHC.

61.     On or about May 21, 2018, at approximately 5:53 p.m., Contractor 1's estimate in the amount of $990.00 was emailed to MOSES at gmoses@neadrochester.org.

62.     On or about May 21, 2019, at approximately 6:43 p.m., MOSES from gmoses@neadrochester.org forwarded the email to WHITE at jwhite015@rochester.rr.com.

63.     On or about May 23, 2018 at approximately 1:04 a.m., WHITE from jwhite@015@rochester.rr.com emailed fraudulent HJJ Property invoice, Invoice #1025, in the amount of $3,000.00 which contained almost the exact description of the service to be performed as the description contained on Contractor 1's estimate, to MOSES at georgemoses@hotmail.com.  The body of the email included the following:

*Please review*

64.     On or about May 23, 2018, at approximately 10:56AM, MOSES from georgemoses@hotmail.com emailed fraudulent HJJ Property invoice #1025 to Kevin White at krwhite89@gmail.com. Kevin White responded:

*Got it, thanks!*

65.     On or about May 23, 2018, at approximately 12:20PM, Kevin White sent an email with fraudulent HJJ Property invoice #1025 to the RHC office manager.  The body of the email contained the following:

14

*Good afternoon,*
*Can we have these invoices processed for the service of the boilers?*
*Thanks.*

66.     On or about May 24, 2018, the RHC paid HJJ Property the fraudulent amount of $3,000.00.

67.     On or about June 2, 2018, WHITE paid Contractor 1 the amount of $990.00 for the services performed by Contractor 1, and caused HJJ Property to reimburse her for such payment.

### *HJJ Property Invoice #1039*

68.     On or about June 5, 2018, at approximately 1:11 a.m., WHITE from jwhite015@rochester.rr.com emailed fraudulent HJJ Property invoice, Invoice #1039, to MOSES at georgemoses@hotmail.com. Fraudulent HJJ Property invoice was for $3,100 for Elmdorf Roofing.

69.     On or about June 7, 2018, fraudulent HJJ Property invoice #1039 was stamped Received by RHC.   However, this stamped invoice totaled $5,270, not $3,100.   The description on this version included "Soffit rotted."

70.     Neither HJJ Property nor any contractor had provided services to the RHC in connection with this fraudulent invoice.   On or about June 8, 2018, the RHC paid HJJ Property the amount of $5,270.

### *HJJ Property Invoice #1059*

71.     On or about on June 27, 2018, Contractor 1 emailed to Kevin White an estimate for boiler cleaning for an amount of $99 per unit, for four units, at a total cost of $396.00.

15

72.     On or about June 28, 2018, at approximately 1:52 p.m., Kevin White from kwhite@rhc1.org forwarded the email to MOSES at gmoses@neadrochester.org. The body of the email contained the following:

*This is for Elmdorf. It's scheduled for Monday the 2nd, at 12pm.*

73.     On June 28, 2018, at approximately 7:18 p.m., MOSES from gmoses@neadrochester.org forwarded the email to himself, possibly to georgemoses@hotmail.com.

74.     On July 5, 2018, at approximately 5:33 p.m., MOSES from georgemoses@hotmail.com forwarded the email to WHITE at jwhite015@rochester.rr.com. The body of the email contained the following:

*300each*

Which meant that WHITE should prepare a fraudulent HJJ Property invoice which increased the amount for the services to be perform by the Contractor 1 to $300 per each unit for a total cost of $1,200.00.

75.     On July 5, 2018, at approximately 9:08 p.m., WHITE from jwhite015@rochester.rr.com emailed fraudulent HJJ Property invoice, Invoice #1059, to MOSES at georgemoses@hotmail.com. The Invoice was for $1,200 for Elmdorf.

76.     On July 5, 2018, MOSES forwarded WHITE's email to Kevin White at krwhite89@gmail.com.

77.     The RHC then paid HJJ Property $1,200.00. WHITE then had HJJ Property pay Contractor 1 the amount of $396.00. Thus, the RHC was defrauded into paying $804.00 more than it should have paid for the services performed by Contractor 1.

### *HJJ Property Invoice #1086*

78.     WHITE prepared a fraudulent HJJ Property invoice, Invoice #1086, dated July 18, 2018, in the amount of $32,554.00 which was submitted to the RHC and paid by the RHC.

79.     Fraudulent HJJ Property Invoice #1086 contained an amount of $26,000.00 for a "Complete roof tear off. Install 30 Year Shingles....Replace damaged raftors". The location identified on the invoice was "Blackwell", a reference to Blackwell Estates, a RHC apartment complex. This work was never performed and thus the RHC was defrauded of $26,000.00. Upon information and belief, Contractor 2 performed services for NEAD, for which Contractor 2 was paid by HJJ Property. The money paid by HJJ Property is believed to have come from the RHC.

80.     Fraudulent HJJ Property Invoice #1086 also contained the amount of $6,554.00 for services that were actually performed by Contractor 1. However, Contractor 1 had submitted an estimate for such services in the amount of $4,554.00, which was later reduced to $3,800. Thus, the RHC was defrauded of $2,754 ($6,554 - $3,800).

### *HJJ Property Invoice #1031*

81.     On or about May 29, 2018, at 10:38 p.m., and again on June 6, 2018, at 9:23 a.m., WHITE from jwhite015@rochester.rr.com emailed fraudulent HJJ Property invoice, Invoice #1031, to MOSES at georgemoses@hotmail.com. Fraudulent HJJ Property invoice #1031 in the amount of $1,200.00, that was submitted by HJJ Property to the RHC related to "16 Diamond Street staging". The fraudulent invoice referenced setup of various rooms and cleaning. Witness B, a former board member of the RHC, was interviewed and stated the she was the one who staged the RHC owned apartment at 16 Diamond Place. Witness B volunteered to perform this work and was not paid any money to do so. Witness B stated she

17

rented furniture from Rent-A-Center and was reimbursed for this expense. Witness B stated she was unaware of an entity known as HJJ Property or anyone else who performed services related to the staging of 16 Diamond Place. Thus, the RHC was defrauded into paying HJJ Property the amount of $1,200.00 for work that was never performed by HJJ Property.

## HJJ Property Had Few If Any Legitimate Business Expenses

82.     A review of financial records for HJJ Property indicate a total of $87,069 was paid to HJJ Property by the RHC. The records also show that while HJJ Property received this money from the RHC, few if any payments were made by HJJ Property to purchase supplies, or to pay wages or other business expenses, and no income from any other entities were received by HJJ Property other than from the RHC. Rather monies from the HJJ Property bank account were used for car loans, a XM radio subscription, $15,460 in cash withdrawals, payments to WHITE, and the purchase of cashier's checks.

## Interstate Wire Communications

83.     Many of the emails used in the scheme and conspiracy traveled in interstate commerce from and to the Western District of New York. Such emails used service providers whose servers were located outside of the State of New York. For example, many of the emails utilized Google Gmail which had servers outside of New York State. Thus, the emails, many of which contained the fraudulent HJJ Property invoices, traveled in interstate commerce.

## OBSTRUCTION OF JUSTICE

84.     There is probable cause to believe that between on or about December 14, 2018, and February 7, 2019, WHITE did (a) knowingly fabricate, alter, cover up, falsify and make

a false entry in records and documents with the intent to impede, obstruct, and influence the investigation into HJJ Property, which WHITE knew was within the jurisdiction of the FBI, in violation of Title 18, United States Code, Section 1519, and (b) corruptly alter a record and document, and attempted to do so, with the intent to impair its integrity and availability for use in an official proceeding, in violation of Title 18, United States Code, Section 1512(c)(1).

**Grand Jury Subpoena**

85.     On December 14, 2018, a Federal Grand Jury Subpoena was served on Howard Jones Jr. as owner of HJJ Property. The subpoena requested any and all records related to HJJ Property and any work HJJ Property performed on behalf of the RHC. The response to the subpoena was due on December 27, 2018.

86.     On December 21, 2018, HJJ Property, through its attorney, requested an extension to January 7, 2019, to respond to the subpoena. On February 7, 2019, HJJ Property provided its response to the subpoena.

**Fraudulent Surveys**

87.     Included in HJJ Property's response to the subpoena were three fraudulent documents which were purported to be surveys signed by a different tenant from three apartment complexes owned by the RHC. The surveys were on HJJ Property letterhead and asked three questions related to the satisfaction of the work performed at the site by HJJ Property. At the bottom of each survey were noted follow up dates; October 2018 and January 2019 for one, and August 2018 and December 2018 for the other two. Based on the follow up dates at the bottom of the surveys, it appeared to the investigating agents when first

reviewing these documents that the surveys were conducted at some point prior to August 2018 and October 2018, and that HJJ Property had in fact performed services for the RHC.

88.     With the surveys were photographs of an individual next to each of the three tenants.  The tenants appeared to be signing or reading the survey.  The investigation identified that individual as WHITE's brother, Larry White.

89.     The three tenants were interviewed and advised that they recalled the specific instance of the survey.  Each tenant recalled that the survey was being conducted in the early part of 2019, possibly in January or February, which was after the subpoena had been served on HJJ Property in December 2018.  Each tenant advised that they had never heard of HJJ Property and were confused as to what they were signing and why a photograph was being taken.

90.     Kevin White, the Operations Manager for the RHC, stated that in or around January 2019, which was after the subpoena was served, WHITE and Larry White showed up unannounced at the RHC property where Witness B was working.  WHITE told Witness B about a survey that needed to be conducted.  Kevin White did not question WHITE as he generally did not feel comfortable questioning her.  Kevin White stated that he then instructed a maintenance employee to bring WHITE and Larry White around to tenants at the RHC.

91.     Witness C, an individual involved in the day to day operations of the RHC, also recalled WHITE and Larry White showing up unexpectedly in January 2019, at the RHC property, which was after the subpoena was served.  Witness C stated that the RHC did not do any work with HJJ Property and felt that WHITE was trying to cover for herself.

92.     Thus, the three surveys were fraudulent in that HJJ Property never performed any services for the RHC.  The three surveys were also prepared after the subpoena was

20

served on HJJ Property and were fraudulently produced in response to the subpoena to make it appear to the investigating agents that HJJ Property was a legitimate company which had performed services for the RHC.

**Fraudulent Invoices**

93.     Also included in the response to the subpoena was a fraudulent invoice from Contractor 1 addressed to HJJ Property. The fraudulent invoice made it falsely appear that Contractor 1 had worked with and been hired by HJJ Property when performing services for the RHC.

94.     On October 11, 2019, the owner of Contractor 1 was interviewed and advised that he had recently been made aware that one of his employees had changed the billing name and address on some of their invoices from the RHC to HJJ Property. The owner identified several telephone calls of which the recordings were saved, evidencing this fact.

95.     One such recorded telephone call occurred on December 17, 2018, three days after the subpoena was served on HJJ Property. The telephone call was between JANIS WHITE and an employee of Contractor 1. During the telephone call, WHITE requested that several invoices previously billed in the name and address of the RHC be changed to the name and address of HJJ Property. When Contractor 1's employee questioned WHITE regarding who HJJ Property was, WHITE falsely stated that "I (HJJ Property) do all the work for them (the RHC)" and that I "looked at the job". WHITE then requested that the revised invoices be emailed to her at jwhite@xposureschools.com.

96.     WHITE then caused HJJ Property to provide the altered invoice to the government in response to the subpoena served on HJJ Property in an attempt to make it appear to the investigating agents that Contractor 1 had in fact been hired by HJJ Property,

21

and not directly by the RHC. At the time of the government's receipt of the altered invoice, the primary issue of the government's investigation was whether or not HJJ Property had in fact provided services to the RHC for the money it received from the RHC.

**Backdated Reimbursement Check**

97.     As stated above in paragraph 68, on or about June 5, 2018, WHITE sent by email to GEORGE MOSES a fraudulent HJJ Property invoice, Invoice #1039, in the amount of $5,270. Neither HJJ Property nor any contractor had provided services to the RHC in connection with this fraudulent invoice. On or about June 8, 2018, the RHC paid HJJ Property the amount of $5,270.

98.     After the subpoena was served on HJJ Property, WHITE caused HJJ Property to reimburse the RHC the amount of $5,270.00 because WHITE knew that no work had ever been performed by HJJ Property and that HJJ Property was not entitled to the payment of $5,270.00, and that the investigating agents might discover this during their investigation of HJJ Property. When reimbursing the RHC, WHITE backdated the HJJ Property check in the amount of $5,270.00 to December 1, 2018, to make it appear that HJJ Property had reimbursed the RHC prior to the government's investigation of HJJ Property. In actuality, HJJ Property had only reimbursed the RHC because of the government's investigation.

## BACKGROND CONCERNING EMAIL

99.     In my training and experience, I have learned that Charter Communications, Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public. Charter Communications, Inc. allows subscribers to obtain mail accounts at the domain name Hotmail.com, like the email account listed in Attachment A. Subscribers obtain an account by registering with Charter Communications, Inc. During the registration

process, Charter Communications, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Charter Communications, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for Charter Communications, Inc. subscribers) and information concerning subscribers and their use of Charter Communications, Inc. services, such as account access information, email transaction information, and account application information. In my training and experience, such information my constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

100.  In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user and users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

101.  In my training and experience, email providers typically retain certain transactions information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) time and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect

23

to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

102. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquires, or complaints from other users. Email providers typically retain records about such communication, including records of contracts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

103. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who sued or controlled the account at a

relevant time. Further, information maintained by the email provider can show who and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.* location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.* communications relating to the crime), or consciousness of guilt (*e.g.* deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

104. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Charter Communications, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Eric J. Bizjak
Assistant Special Agent in Charge
U.S. Department of HUD
Office of Inspector General

Subscribed to and sworn before me
this 13 th day of November 2019

HONONORABLE MARIAN W. PAYSON
United States Magistrate Judge

26